# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOYCE COUNTS, )
        Plaintiff, )
                              )    Civil Action No. 08-85 Erie
    v. )
ERIC K. SHINSEKI, )
Secretary, Department of Veterans Affairs,[1] )
        Defendant. )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

Plaintiff, Joyce Counts ("Plaintiff"), filed a Complaint on March 26, 2008 alleging that she had been discriminated against on the basis of her gender and age, and had been subjected to unlawful retaliation during her employment at the Erie VA Medical Center ("Defendant" or "VA"). See Complaint. Plaintiff has confined her retaliation claim to three (3) alleged incidents relating to an investigation conducted by the VA and/or the Office of Inspector General, as set forth in paragraph 37, subparagraphs (o), (p) and (r) of the Complaint, namely that:

> o.    On or about April 11, 2006, after being informed that she was under investigation (but she was not told the nature of the investigation), Plaintiff's tour of duty was changed from 6 a.m. to 2 p.m., to 8 a.m. to 4:30 p.m. (Monday through Friday), when she was detailed to Executive Leadership, Office of Performance & Quality;
>
> p.    On or about April 12, 2006, the Plaintiff was subjected to an illegal arrest and false imprisonment when she was forcibly detained and required to retrieve her laptop due to a so called "investigation."
>
> r.    On or about May 12, 2006, Plaintiff learned that she was being detailed from the Executive Leadership, Office of Performance & Quality, to a Fee Clerk position in Medical Administration, and management refused to provide Plaintiff with a reason for the reassignment other than noting that she was under investigation.

---

[1] James B. Peake was initially named as the Defendant in this case. Erik K. Shinseki succeeded Dr. James B. Peake as Secretary of the Department of Veterans Affairs on January 21, 2009. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Shinseki is automatically substituted for Dr. Peake as the party defendant in this case.

See Complaint ¶ 37 (o), (p), and (r). Defendant has moved for summary judgment and the matter is fully briefed and ripe for disposition. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND

Plaintiff has been employed at the VA since 1986. See Def. Ex. 1, Counts Dep. pp. 36; 46. In December 1998, Plaintiff began working in the Information Technology ("IT") Department, also known as Information Resource Management ("IRM") or Information Systems ("IS"). Def. Ex. 1, Counts Dep. pp. 47-49. Plaintiff and co-worker Ila Tordoff ("Tordoff") filed an EEOC complaint in October 1999 based on an alleged hostile environment and retaliatory conduct ("Counts I"). Pl. Ex. 23A, Counts Dep. pp. 65-67; Def. Ex. 7, EEOC Decision in Counts I, pp. 1-2. In a decision dated August 16, 2001, an Administrative Law Judge ("ALJ") concluded that the Plaintiff and Tordoff had been subjected to a hostile work environment. Pl. Ex. 23A, Counts Dep. p. 68; Def. Ex. 7, EEOC Decision in Counts I, pp. 2; 12. Plaintiff subsequently filed a federal lawsuit relative to that claim that was ultimately settled by the parties. Pl. Ex. 23B, Counts Dep. pp. 70-71.

On August 16, 2004, the Plaintiff filed another EEOC complaint asserting a retaliation claim based upon various incidents that allegedly occurred during the summer and autumn of that year ("Counts II"). Pl. Ex. 23B, Counts Dep. pp. 72-73; Def. Ex. 8, EEOC Decision in Counts II, pp. 1-2. In connection with this complaint, the Plaintiff testified at a hearing before an ALJ on March 21 and 22, 2006. Def. Ex. 8, EEOC Decision in Counts II, pp.1-2. On July 31, 2006, the ALJ issued a decision in favor of the VA. Def. Ex. 8, EEOC Decision in Counts II, p. 13.

In January 2005 Christina Hessler ("Hessler") was assigned to the IT Department. Def. Ex. 12, Counts AIB Testimony, p. 64. For reasons that are not apparent from the record, the Plaintiff and Hessler had difficulty getting along with each other. On February 8, 2006, Hessler sent a memorandum to David Wood ("Wood"), the Acting Director of the VA, outlining several actions on the part of the Plaintiff that she felt were creating a "hostile work environment." Pl. Ex. 25, Wood Dep. p. 31; Def. Ex. 10, AIB Decision p. 4.[2] Wood initiated an Administrative

---

[2] Wood was the Acting Director of the VA from September 2005 until approximately April 2006. Pl. Ex. 25, Wood Dep. p. 31.

Investigation Board ("AIB") for the purpose of investigating Hessler's and the Plaintiff's complaints against each other. Pl. Ex. 25, Wood Dep. pp. 34; 42. The AIB conducted an investigation and in a report dated March 23, 2006, concluded that, *inter alia*, "[t]here [was] clearly a strained working relationship between Ms. Counts and Ms. Hessler that [was] having an overall adverse impact on the working environment of the IRM department." Def. Ex. 10, AIB Decision, p. 7.

On March 24, 2006, while performing routine maintenance on the VA computers, Hessler found evidence that a former VA employee, John Riley ("Riley"), may have accessed the desk top computers of two VA employees following his termination. Def. Ex. 2, CRI, p. 1, Attachment 10, p. 2.[3] On March 28, 2006, Hessler also found evidence that Riley may have improperly accessed the VA server, based upon information reflected in the "Documents and Setting" folder. Def. Ex. 2, CRI, Attachment 10, p. 2. Hessler reported her concerns relative to a possible security breach of the computer network to Lorraine Hummel ("Hummel"), the VA's Information Security Officer ("ISO"), who in turn informed Beth Sahlmann, ("Sahlmann"), the Plaintiff's immediate supervisor and Acting Associate Director of Business Operations. Pl. Ex. 14, Hummel EEO Aff. p. 3; Def. Ex. 2, CRI, Attachment 1 p. 6; Def. Ex. 15, Sahlmann EEO Aff. pp. 4-5.

On April 7, 2006, Hessler was informed by VA employee Ron Rycek ("Rycek"), that he had observed the Plaintiff make "several trips in and out with lots of stuff." Def. Ex. 2, CRI, Attachment 10, p. 9. Upon exiting the building Hessler observed Riley and the Plaintiff in the parking lot, at which time Riley was holding "several large white binders." Def. Ex. 2, CRI, Attachment 10, p. 9. Hessler also reported this observation to Hummel and Sahlmann. Def. Ex. 2, CRI, Attachment 10, pp. 9-10.[4] She stated that she could not hear what the Plaintiff said, but heard Riley say: "I don't care if she sees us, she can't do anything to me." Def. Ex. 2, CRI,

---

[3] Riley had worked with the Plaintiff in the IT Department and had provided testimony in support of her EEOC complaints in Counts I and Counts II. See Riley v. Shinseki, 2009 WL 2957793 at *1 (W.D.Pa. 2009). He was terminated by the VA in November, 2005 as a result of his role in a server crash and data loss incident. Id. at *2-3.

[4] At deposition, Plaintiff admitted that Hessler passed by the back of her car as she was handing Riley "two books" containing the transcripts of her EEO hearing testimony. Plaintiff's Ex. 1, Counts Dep. pp. 100-102.

3

Attachment 10, p. 9.

As a result of Hessler's reports, an investigation was commenced on April 8, 2006 by Hummel, Hessler, VA Police Officer Matthew Tuzynski ("Tuzynski") and Brian Wilshire ("Wilshire"), to determine if any VA property was missing. Def. Ex. 2, CRI, Attachment 10, p. 4. As a result of this investigation, it was determined that a box of personal items belonging to Riley, the hard drive from the computer previously assigned to Riley, and several binders from a bookcase could not be located. Def. Ex. 2, CRI, Attachment 10, p. 4; Def. Ex. 6, Hummel Dep. pp. 33-35. Based on Hessler's observations, there was a concern that the Plaintiff may have given Riley the hard drive from his computer. Def. Ex. 2, CRI p. 2.

A conference call was subsequently held on April 10, 2006 with Donald Wetzel ("Wetzel"), the Acting Director of the VA,[5] Hummel, Sahlmann, an "IG Investigator," Chief Information Officer John Hrichardson ("Hrichardson") and ISO Randy Ledsome ("Ledsome"). Def. Ex. 2, CRI, Attachment 1, p. 4; Def. Ex. 6, Hummel Dep. pp. 40-42; Pl. Ex. 16, Wetzel EEO Aff. pp. 6-7. Due to a perceived "[i]mminent threat" to the VA computer system, a decision was made to conduct an expedited investigation through the Office of the Inspector General ("OIG" or "IG"). Def. Ex. 2, CRI, Attachment 1 pp. 4-5; Def. Ex. 14, Wetzel Aff. pp. 6-7. In order to safeguard the security of the system during the investigation, it was deemed prudent to limit the Plaintiff's access to the computer system, temporarily reassign her to another position, and to secure the Plaintiff's laptop. Def. Ex. 2, CRI, Attachment 1 pp. 4-5; Def. Ex. 14, Wetzel Aff. pp. 6-7. The decision to retrieve the laptop was occasioned by the concern that Riley may have accessed the network through the Plaintiff's laptop. Def. Ex. 6, Hummel Dep. pp. 55-56.

On April 11, 2006, the Plaintiff met with Sahlmann and was informed that she was being reassigned to the Office of Performance and Quality ("OPQ"). Pl. Ex. 23C, Counts Dep. pp. 150-151. She was also advised that she was under investigation, but was not advised at that time as to its nature. Pl. Ex. 23C, Counts Dep. p. 150; Def. Ex. 15, Sahlmann Aff. p. 25. Plaintiff characterized her duties in the OPQ Department as essentially involving "typ[ing] documents"

---

[5] Wetzel was the "Nurse Executive" at the VA and was the Acting Director in the absence of the official Acting Director. Def. Ex. 14, Wetzel Aff. p. 3.

4

with little or no additional responsibility. Pl. Ex. 23A, Counts Dep. pp. 56-57. It is undisputed however, that she did not receive a different rate of pay, nor did she receive a demotion in her grade. Pl. Ex. 23A, Counts Dep. p. 57.

On April 12, 2006, Hummel, Tuzynski and Stephen Bielecki ("Bielecki"), the Facility Manager, met with the Plaintiff in order to retrieve the laptop. Pl. Ex. 24B, Tuzynski Dep. p. 22. According to the Plaintiff, upon returning from lunch she was confronted by Hummel, Bielecki and Tuzynski, who was dressed in his "police garb." Def. Ex. 1, Counts Dep. p. 78. Plaintiff claims that, with his hand on his pistol, Tuzynski repeatedly informed her that she had no choice but to be escorted home in a VA van and turn over her VA laptop to Hummell. Def. Ex. 1, Counts Dep. pp. 79-80. According to the Plaintiff, Tuzynski placed his hands on her shoulder and walked her down the stairs and placed her in the van. Def. Ex. 1, Counts Dep. p. 80. Plaintiff indicated that she was directed where to sit and was locked in the van when the door was closed. Def. Ex. 1, Counts Dep. p. 81. When she arrived at her home with Hummel and Bielecki, the Plaintiff retrieved the laptop and handed it to Bielecki who wrapped it in "red evidence tape." Def. Ex. 1, Counts Dep. p. 83.

Plaintiff remained in the OPQ position for approximately one month, until the project she was assigned to was completed. Pl. Ex. 9, Sahlmann Aff. pp. 28-29. As a result of staffing shortages, she was reassigned to a Fee Clerk position in Health Administration effective May 15, 2006. Pl. Ex. 9, Sahlmann Aff. p. 29; Pl. Ex. 23A, Counts Dep. p. 56. Although the Plaintiff's pay, grade and step did not change as a result of this assignment, the Plaintiff testified that she was physically moved to the basement, placed in the back of the office in a corner facing a wall, and was relegated to "scan[ning] documents." Pl. Ex. 23A, Counts Dep. pp. 58-59.[6]

Ultimately, a report styled "Comprehensive Report of Investigation" ("CRI") prepared by Reporting Agent Timothy D. Barry of the OIG exonerated the Plaintiff, concluding that the allegations related to the missing hard drive and unauthorized computer access were not substantiated. Def. Ex. 2, CRI pp. 2-4. Agent Barry provided the following synopsis of the investigation's findings and conclusions:

---

[6] Plaintiff stopped working on November 6, 2006. Pl. Ex. 23A, Counts Dep. pp. 49-50. If appears from the record that there is a pending workers' compensation claim. Pl. Ex. 23A, Counts Dep. pp. 49-50.

5

> This case originated on April 17, 2006 upon receipt of a VA-Office of Inspector General Hotline Referral submitted by the VA Medical Center (VAMC) - Erie, PA. The referral contained two allegations concerning former VA employee John A. RILEY. RILEY was suspected of accessing the VAMC - Erie computer network without authorization after his November 2005 termination from VA employment. He was also suspected of being in possession of a missing computer hard drive from a VA computer that was assigned to him during his term of employment.
>
> The Hotline Referral also indicated that VAMC employee Joyce COUNTS could have assisted RILEY in the removal of the computer hard drive from VA property.
>
> This investigation found no evidence that RILEY accessed the VA computer network without authorization. The missing computer hard drive was turned in by VA employee Floyd Titus, who reported that he had removed it from the computer formerly assigned to RILEY and subsequently used it to perform his IT duties.

Def. Ex. 2, CRI p. 1.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In order to withstand a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating whether the non-moving party has established each necessary element, the Court must grant all reasonable inferences from the evidence to the non-moving party. Knabe v. Boury Corp., 114 F.3d 407, 410, n.4 (3d Cir. 1997) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita, 475 U.S. at 587).

## III. DISCUSSION

In support of his motion for summary judgment, the Defendant argues that the present

action is untimely; that Plaintiff failed to exhaust her administrative remedies relative to the laptop incident; that Plaintiff has failed to establish a *prima facie* case of retaliation; and alternatively, has failed to raise a triable issue of fact as to pretext. I shall address each of these contentions in turn.

### A. *Limitations*

Pursuant to Title VII, a federal employee has ninety (90) days from the receipt of the right-to-sue letter issued by the EEOC within which to file a complaint in federal court. 42 U.S.C. § 2000e-16(c) ("Within 90 days of receipt of notice of final action ... on a complaint of discrimination ... an employee ... may file a civil action ... ."). Courts have treated this ninety day provision as a statute of limitations. Burgh v. Borough Council of Montrose, 251 F.3d 465, 470 (3rd Cir. 2001). The provision has been strictly enforced by the courts, and the Third Circuit has held that "a claim filed even one day beyond its ninety day window is untimely and may be dismissed absent an equitable reason for disregarding the statutory requirement." Figueroa v. Buccaneer Hotel, 188 F.3d 172, 176 (3rd Cir. 1999) (citing Mosel v. Hills Dep't Store, Inc., 789 F.2d 251, 253 (3rd Cir. 1986)). The clock begins to run when either the plaintiff or counsel for plaintiff receives the right-to-sue letter, whichever is earlier. Seitzinger v. Reading Hospital and Medical Center, 165 F.3d 236, 239 n.1 (3rd Cir. 1999). Defendant bears the burden of proof when asserting a statute of limitations defense. Ebbert v. DaimlerChrylser Corp., 319 F.3d 103, 108 (3rd Cir. 2003).

As previously indicated, the Plaintiff filed the instant action on March 26, 2008. Consequently, in order to be timely, the Plaintiff must have received the FAD no earlier than December 27, 2007. It is undisputed that the EEOC issued the Plaintiff a right-to-sue letter on December 19, 2007 and that it was mailed to the Plaintiff the next day via certified mail. Def. Ex. 4, Crutchfield Dec. ¶¶ 4; 6; Def. Ex. 4A, FAD. Plaintiff disputes only the date of receipt. Defendant has submitted the return receipt card which appears to bear the signature of "James Counts" and a handwritten delivery date of December 24, 2007. Def. Ex. 4C. Plaintiff claims that she did not receive the FAD until December 27, 2007, and in support thereof, has attached the affidavits of her husband and counsel. Pl. Ex. 2, Counts Aff.; Pl. Ex. 1, Filippi Aff. The affidavit of James Counts states, in relevant part:

7

> 3. On or about December 27, 2007, while the undersigned was at his home at 2509 East 26th Street, Erie, Pennsylvania 16510, a United States postal delivery person delivered a Certified Letter from the Department of Veterans Affairs Office of Employment Discrimination.
>
> 4. At that time, the undersigned signed for the document.
>
> 5. At that time, there was no date of delivery on the purported "green card" of which the undersigned signed.
>
> 6. Specifically, due to the fact that this was on or about the Christmas holiday, and the undersigned and his wife, the Plaintiff, were caring for Plaintiff's stepmother who was gravely ill, the undersigned was not at home from December 24 through December 26 and therefore could not receive mail.
>
> 7. Moreover, the first day that the undersigned and his wife returned from their holiday was December 27, 2007, two (2) days after Christmas.
>
> 8. The first receipt of any certified mail occurred on December 27, 2007.

Pl. Ex. 2, James Counts Aff. ¶ 3-8. Plaintiff's counsel avers in his affidavit:

> 9. On December 27, 2007, the undersigned counsel was served a copy of the Final Agency Decision in Case Number 589 by United States Mail, Return Receipt Requested.
>
> 10. A copy of the envelope from the Department of Veterans Affairs ... is attached to this Affidavit.
>
> 11. The envelope contains a Certified Mail Tracking Number. Utilizing the Postal Service Certified Mail Tracking Number, the undersigned counsel obtained a "Track and Confirm Receipt" from the U.S. Postal Service web site. A copy of the "Track and Confirm" Receipt is attached hereto and incorporated herein.
>
> 12. The "Track and Confirm" Receipt indicates that the label receipt number ending in 4652 was delivered to the undersigned on December 27, 2007 in Erie, Pa. 16501.
>
> 13. The undersigned counsel also confirmed that Plaintiff received a copy of the Final Agency Decision on that date.
>
> 14. The averment in the Amended Complaint that the Plaintiff was served the Final Agency Decision in Case Number 589 is based on service on counsel of record, confirmed by service upon the Plaintiff.

Pl. Ex. 1, Filippi Aff. ¶¶ 9-14.

Defendant urges the Court to apply the presumption that the Plaintiff received the FAD three days after it was mailed, resulting in a delivery date of December 24, 2007.[7] The operative effect of the presumption was addressed by the Third Circuit Court of Appeals in Seitzinger:

> When the actual date of receipt is known, that date controls. However, in the absence of other evidence, courts will presume that a plaintiff received her right-to-sue letter three days after the EEOC mailed it. *See* Fed.R.Civ.P. Rule 6(e) [now found at 6(d)]; *Mosel*, 789 F.2d at 253 n.2 (stating that the Supreme Court has suggested that Rule 6(e) applies when the parties dispute the date of receipt). Rule 6(e)'s three-day presumption attempts to ensure that the plaintiff has the benefit of the full ninety-day period when the date of actual receipt is unknown.

Seitzinger, 165 F.3d at 239. Defendant contends that the application of this presumption compels the Court to enter judgment in his favor. This three day presumption, however, is a rebuttable one. Ebbert, 319 F.3d at 108 n.5; see also Payan v. Aramark Management Services Limited Partnership, 495 F.3d 1119, 1124 (9th Cir. 2007); Sherlock v. Montefiore Medical Center, 84 F.3d 522, 526 (2nd Cir. 1996). It is the Plaintiff's burden to rebut the presumption. Olan v. RR Donnelley & Sons Co., 2007 WL 2997967 at *2 (E.D.Pa. 2007).

A plaintiff however, will be unable to rebut the presumption simply on the basis of his or her own unsupported contention that the FAD was not received on the presumptive date. See e.g., Jaramillo v. Solis, 2010 WL 1382551 at *3 (D.N.J. 2010) ("Here, Ms. Jaramillo has produced no evidence, beyond her bare statements, that the letter was received on January 31 and not before. Such statements, without more, are insufficient to rebut Rule 6(e)'s presumption, especially in light of the DOL's submissions."); Dupree v. United Food and Commercial Workers Union, 2005 WL 41562 at *2 (D.Del. 2005) ("In this case, it is undisputed that the EEOC issued and mailed the Dismissal and Notice of Rights letter on June 10, 2003. The defendant received the letter on or about June 14, 2003. By contrast, DuPree maintains that he received the letter on July 7, 2003. Because he offers no evidence in support of this bare assertion, however, Rule 6(e), presuming receipt after three days from the mailing date, must be applied."); Arots v. Salesianum School, Inc., 2003 WL 21398017 at *2 (D.Del. 2003) (same).

The affidavits filed in support of the Plaintiff's contention as to the date of receipt of the

---

[7] Because December 23, 2007 fell on a Sunday, the presumed delivery date is Monday, December 24, 2007. Fed. R. Civ. P. 6(a)(1)(C).

9

FAD are sufficient, in my view, to rebut the presumption of receipt and raise a triable issue of fact as to the actual date the FAD was received.

### B. *Exhaustion*

Defendant contends that he is entitled to summary judgment with respect to the laptop retrieval incident based upon the Plaintiff's alleged failure to administratively exhaust this claim. A plaintiff alleging discrimination pursuant to Title VII must exhaust her administrative remedies prior to bringing a claim in federal court. 42 U.S.C. § 2000e-16(c); Burgh, 251 F.3d at 470. The Third Circuit has recognized that exhaustion serves two purposes:

> First, it puts the employer on notice that a complaint has been lodged against [it] and gives [it] the opportunity to take remedial action. Second, it gives the EEOC notice of the alleged violation and an opportunity to fulfill its statutory responsibility of seeking to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion.

Bihler v. Singer, Co., 710 F.2d 96, 99 (3rd Cir. 1983). The exhaustion requirement does not demand "an exact correspondence between the face of the EEOC charge and the face of the district court complaint." Young v. School Dist. of Philadelphia, 2007 WL 2319767 at *2 (E.D.Pa. 2007). Rather, the relevant test is whether "the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Antol v. Perry, 82 F.3d 1291, 1296 (3rd Cir. 1996); Robinson v. Dalton, 107 F.3d 1018, 1025 (3rd Cir. 1997).

Here, I find that the Agency actually investigated allegations with respect to the laptop retrieval incident. EEO Investigator Ida O'Neal ("O'Neal") interviewed Hummel, Wetzel, Tuzynski and Bielecki on December 15, 2006 concerning the circumstances surrounding the April 12, 2006 incident. Pl. Exs. 14; 17-19. The FAD dated December 19, 2007 summarizes the parties' respective positions regarding the incident:

> As for claim (A11), Complainant says, on or about April 11, 2006, Ms. BS changed her tour of duty (from 6 a.m. to 2 p.m, to 8 a.m. to 4:30 p.m.) telling Complainant she was under investigation, and management removed, her access to the computer system, telling her she was going to be isolated into an outer building. When Complainant asked for "what," Ms. BS replied she "didn't know." Complainant says this occurred 20 days after her hearing before an administrative judge. **She says management took this action based on an alleged "anonymous" tip, which included forcing**

10

> **Complainant to be driven in a government van to her home to retrieve her government laptop computer, which they marked as "evidence" with red tape. Complainant says management has failed to adequately explain its conduct regarding this claim and the so-called criminal investigation against her.** ... Def. Ex. 4A p. 8.
>
> • • •
>
> ... Mr.DW ... stated he was the Acting Director at the time the events in question occurred, when Ms. LH informed him that computer products were likely missing, including a computer hard drive that Complainant had access to. Thus, it was for these reason[s] that he initiated appropriate investigatory measures, which included limiting Complainant's computer access and moving her to another location, as management conducted the law enforcement styled investigation. Mr. DW states that the FBI had advised management that it should not give Complainant any details of the investigation or her reassignment, as they were concerned that, if she had taken a hard drive or other computer information, she might attempt to destroy those computer products. ... **Mr. DW stated that management took necessary steps to retrieve a government issued laptop computer from Complainant's residence, which included driving Complainant to her resident to retrieve that computer product.** ... Def. Ex. 4A p. 10.

Def. Ex. 4A pp. 8; 10 (emphasis added).

Finally, the EEOC made specific findings relative to the Defendant's actions with respect to the laptop retrieval incident:

> ... [W]e find that management had a right to hold its employee accountable in both the day-to-day activity, the disciplinary concerns discussed, and the security and investigatory matters referred to in this case. For example, while Complainant may have disagreed with management's conduct and concerns when a potential theft of software and hardware (apparently, based on an anonymous tip) was brought to management's attention, we cannot find, by a preponderance of the evidence, that management officials initiated appropriate security measures, or took other related actions, for a discriminatory purpose forbidden by Title VII, as opposed to management initiating appropriate and genuine responses to supervising and investigating a subordinate working in a sensitive (computer systems) position. For all these reasons, we find that Complainant fails to establish pretext for management's conduct and decisions, relating to each of her claims raised in this case. We also find that her sex, age and prior EEO activity were not considered in management's decisions in this case.

Def. Ex. 4A p. 26 (footnote omitted).

11

In light of the above, I find that the retaliation claim based on the retrieval of the laptop has been administratively exhausted.  See Waiters v. Parsons, 729 F.2d 233, 238 (3rd Cir. 1984) (finding that the "investigation clearly went beyond the specific problem alleged in the formal complaint"); DeFazio v. The River City Brass Band, Inc., 2007 WL 4390333 at *2 (W.D.Pa. 2007) (finding plaintiff exhausted administrative remedies where allegations brought to the attention of the EEOC and were part of the investigation); Kajder v. Community College of Allegheny, 2005 WL 3533119 at *5 (W.D.Pa. 2005) (holding that evidence relating to a racial retaliation claim had been presented to and considered by the PHRC and "[a]s a result, this court's reexamination of that evidence will neither prejudice [defendant] nor interfere with the policies underlying prior administrative review.").

### C. *Retaliation claim*

#### 1. *Adverse employment action*

In order to establish a *prima facie* case of retaliation, a plaintiff must establish: (1) that she engaged in protected activity; (2) an adverse employment action was taken; and (3) there was a causal connection between the protected activity and the adverse action.  Moore v. City of Philadelphia, 461 F.3d 331, 340-42 (3rd Cir. 2006).  Defendant does not dispute that the Plaintiff engaged in protected activity, see Defendant's Brief p. 31; rather, he contends that she cannot establish the second and third elements of the *prima facie* case.

In Burlington Northern & Santa Fe Railroad Co. v. White, 548 U.S. 53 (2006), the United States Supreme Court interpreted the anti-retaliation provisions of Title VII to include conduct more expansive than traditional employment-related actions.  Id. at 67-69.  A plaintiff must show that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern, 548 U.S. at 68; Moore, 461 F.3d at 341.  As stated by the court in Hare v. Potter, 220 Fed. Appx. 120, 127 n.4 (3rd Cir. 2007):

> This definition of adverse employment action is the result of the Supreme Court's decision in June 2006 in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).  Prior to *Burlington Northern*, this Court defined an adverse employment action as one that "alter[ed] the employee's compensation, terms, conditions, or privileges of employment, deprive[ed] him or her of employment opportunities, or adversely

12

> affect[ed] his or her status as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997) (internal quotation and citation omitted). ... The new standard "protects an employee from a wider range of conduct" than the old one. *Phelan v. Cook County*, 463 F.3d 773, 781 n. 3 (7th Cir. 2006).

Hare, 220 Fed. Appx. at 127 n.4. Nevertheless, "[i]n evaluating whether actions are materially adverse, [the Court] must remain mindful that 'it is important to separate significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'" Moore, 461 F.3d at 346 (quoting Burlington Northern, 548 U.S. at 68).

Defendant contends that the Plaintiff cannot demonstrate that her two reassignments, as well as the retrieval of her laptop, constituted adverse actions under Burlington Northern and its progeny. Specifically, the Defendant points to the fact that the Plaintiff suffered no reduction in pay as a result of her reassignments. Defendant characterizes the laptop retrieval as nothing more than a "trip to plaintiff's residence, accompanied by Erie VAMC employees, to retrieve her VA-issued laptop." See Defendants Brief pp. 11-12.

The record reflects that prior to her first transfer of April 11, 2006, the Plaintiff was a high level IT Specialist whose duties required significant access to the computer system in the performance of her duties. Although her salary was not reduced, her access was restricted, and she was relegated to performing largely clerical duties such as typing documents in the OPQ Department. Pl. Ex. 23A, Counts Dep. pp. 55-58. Similarly, although her transfer to the Fee Clerk position did not result in any monetary loss, she was physically relocated to the basement, allegedly "shoved in a corner" with no light or access, and her duties were considerably constricted and involved largely "scan[ning] documents." Pl. Ex. 23A, Counts Dep. pp. 55-56; 58.

Here, given the Plaintiff's contentions that the temporary positions were mainly clerical in nature, as opposed to her more substantive responsibilities in the IT Department, and involved less desirable physical surroundings, I find that the Plaintiff has raised an issue of fact as to the allegedly adverse nature of her reassignments. See Burlington Northern, 548 U.S. at 69 (holding that whether reassignment of the plaintiff from a forklift operator position to track labor duties

13

rose to the level of a materially adverse action was for the jury given evidence that forklift operator position had higher prestige, was considered better job and was less arduous than track labor position); Moore 461 F.3d at 348 (holding that a jury could consider the plaintiff's lateral transfer as the kind of action that might dissuade a police officer from making or supporting a charge of discrimination); Yeager v. UPMC Horizon, 2010 WL 1024591 at *18 (W.D.Pa. 2010) (whether a reasonable employee would find that being prohibited from working from home was materially adverse was a question of fact for the jury to determine); Neal v. Daily's Juice, 2009 WL 331591 at *6 (W.D.Pa. 2009) (holding that genuine issue of material fact as to whether employee's placement in unfavorable work location constituted an adverse employment action precluded summary judgment).

I also find that the evidence, when viewed in the light most favorable to the Plaintiff, raises a triable issue of fact at to whether the events surrounding the retrieval of her laptop constituted an adverse employment action. Plaintiff was confronted in her office by VA management, as well as a VA Police Officer, and informed that she had to surrender her VA laptop. As previously discussed, the Plaintiff alleges that Officer Tuzynski placed his hand on his pistol, repeatedly informed the Plaintiff that she had "no choice" but to accompany Hummel and Bielecki to her home in a VA van, physically placed his hands on her shoulders and escorted her down the stairs and out of the building, and "put [her] in the van." Def. Ex. 1, Counts Dep. pp. 77-83.

### 2. *Causation*

Defendant argues, in the alternative, that the Plaintiff's protected activities were so temporally remote from the alleged adverse employment actions that she cannot establish the requisite causal connection as a matter of law. The requisite causation may be established by showing a close temporal proximity between the protected activity and the alleged retaliatory conduct, or by submitting "circumstantial evidence ... that give[s] rise to an inference of causation." Marra v. Philadelphia Housing Authority, 497 F.3d 286, 302 (3rd Cir. 2007). A plaintiff can rely on a "broad array" of evidence to show the requisite cause and effect. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 283-84 (3rd Cir. 2000). Such evidence "is not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus," but can be

14

"other evidence gleaned from the record as a whole from which causation can be inferred." Farrell, 206 F.3d at 281.[8]

Temporal proximity between an employee's protected activity and an adverse employment action can be sufficient to establish causality for purposes of a *prima facie* case of retaliation under Title VII if it "unusually suggestive." Compare Jalil v. Avdel Corp., 873 F.2d 701, 708 (3rd Cir. 1989) (holding that two days between protected activity and an adverse action is "unusually suggestive" of retaliatory motive) with Andreoli v. Gates, 482 F.3d 641, 650 (3rd Cir. 2007) (five month time period, without additional evidence, insufficient to raise an inference of causation); LeBoon v. Lancaster Jewish Community Center Association, 503 F.3d 217, 233 (3rd Cir. 2007) (gap of three months, without more, cannot create an inference of causation); Williams v. Philadelphia Housing Auth. Police Dept., 380 F.3d 751, 760 (3rd Cir. 2004) (two months not "unusually suggestive"), cert. denied, 544 U.S. 961 (2005).

Here, the record reflects that the Plaintiff testified in support of her claim in Counts II on March 21 and 22, 2006. Both the initial reassignment to the OPQ Department (April 11, 2006) and the laptop retrieval incident (April 12, 2006) occurred within three weeks of her testimony. This time frame is sufficiently close, in my view, to raise an inference as to causation.

### 3. Pretext

As discussed above, the Defendant claims the employment actions at issue in this case were taken based upon the good faith belief that the Plaintiff may have been involved in facilitating a breach of the VA computer system.

In order to defeat the Defendant's summary judgment motion, the plaintiff must point to some evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Stanziale v. Jargowsky, 200 F.3d 101, 105 (3rd Cir. 2000); Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 331 (3rd Cir. 1995).

A plaintiff can establish the first prong by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

---

[8]The Plaintiff in this case relies exclusively on temporal proximity.

legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3rd Cir. 1992)). A plaintiff may not, however, "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3rd Cir. 1997) (quoting Fuentes, 32 F.2d at 765). In other words, the plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." Keller, 130 F.3d at 1109.

To satisfy the second prong, the plaintiff must point to evidence "that proves ... discrimination in the same way that critical facts are generally proved -- based solely on the natural probative force of the evidence." Keller, 130 F.3d at 1111. The plaintiff can establish the second prong by showing that the employer in the past subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not within his class more favorably, or that the employer discriminated against other members of his protected class. Fuentes, 32 F.3d at 765.

At oral argument, Plaintiff's counsel articulated the basis for his contention that a genuine issue of material fact relative to pretext had been raised:

> THE COURT: Assuming that you make out a prima facie case, then the last whistle stop, so to speak, on this train ride is the question of pretext. You have to, at the end of the day, address their legitimate nondiscriminatory reasons and raise sufficient evidence of record to raise a triable issue of fact on pretext. Let me begin by saying that the fact that the investigation ultimately exonerated your client is not, in my view, evidence of pretext. Because if that was the case, it would inappropriately shift the focus from result to mind set. So I want to make sure that I didn't misunderstand your position. Is it really your position that the fact that they exonerated her is evidence that the initial investigation was pretextual?
>
> MR FILIPPI: Well, I think it creates an inference that they didn't come up with anything. I mean had they come up with something, I think that the argument could be that there was a valid basis to the original investigation.
>
> THE COURT: Let's put that on the shelf. Putting that on the shelf, tell me, in whatever order or form you want, because this

obviously is important, what evidence is there that would suggest that this whole thing was nothing but a sham or pretext?

MR. FILIPPI: I'll start by saying, to say that Ms. Hessler did not participate in the decision-making is not accurate. Ms. Hessler was the source of this problem to begin with. Ms. Hessler and Ms. Counts had just in February had an AIB investigation dealing with cross-claims against each other regarding workplace harassment, hostility. There had been longstanding, ongoing animosity between these two individuals. She's the only witness, the anonymous tip, that sends this series of events into motion. Claiming that she saw, and **we don't dispute actually there was a transfer of deposition transcripts** –

THE COURT: ... Your suggestion is her credibility was suspect and the VA should have known it was suspect because she and your client had this long running gun battle, if you will, that's in part your point. But where does that lead you if as a factual matter your client does not dispute what Ms. Hessler reported?

MR. FILIPPI: Well, the importance given to this transfer of information was taken advantage of by the management and the decision-makers. Because Ms. Hessler, I mean it was well-known to them that this AIB investigation occurred just two months earlier. And she comes to them with this anonymous tip about the exchange of information, or exchanging of materials, with no more. Which they readily grabbed and ran with. Without further investigation, without any further verification that something – in fact, I think the testimony during discovery was that they did look around the office and didn't find anything missing. There was some question about computer books and binders. In fact, they were there all the time.

THE COURT: Let me ask you this, just so I can test the principle. Wouldn't you have a better argument on pretext if Ms. Hessler went to the authorities at the VA and said I saw Joyce Counts transfer this book, what appeared to be a binder, to Mr. Riley in the parking lot. And your client, when questioned about it, said that transfer never occurred. And yet they acted on Ms. Hessler's report. In that case her credibility is squarely at issue, they know she has an ax to grind and they rely on her. That would be better, wouldn't it?

MR. FILIPPI: **I would agree, sure, I think that would be better**.

• • •

THE COURT: Fundamentally, not to put words in your mouth, in fact I'll use your words. You said it was an unreasonable investigation. I take it from that that in your view the record fairly

17

> read here suggests in your view an overreaction on the part of the VA?
>
> MR. FILIPPI: I think there was an overreaction and jumping of the gun to take advantage of this incident that Hessler identified without doing an adequate investigation and really just doing something simple things that could have been done, instead of getting so heavy-handed in the reaction to this.

Hearing on Defendant's Motion for Summary Judgment Tr. pp. 36-41 [Doc. No. 61] (emphasis added).

As reflected in the oral argument, the Plaintiff contends that a triable issue of fact as to pretext is raised based upon the Defendant's knowledge of the long-standing animosity between the Plaintiff and Hessler, the alleged inadequacy and "heavy handedness" of the investigation, and the fact that the Plaintiff was ultimately exonerated of any wrongdoing.

Defendant's knowledge of the long-standing feud between the Plaintiff and Hessler could have been potentially material in the pretext analysis if Hessler's credibility was genuinely at issue. It was not. Importantly, the Plaintiff does not dispute, and there is no evidence to suggest, that Hessler's concerns relative to Riley's possible unauthorized access of the computer system were not justified. Nor does the Plaintiff dispute the accuracy of Hessler's report to her superiors relative to the exchange she observed in the parking lot between the Plaintiff and Riley.

Moreover, the Plaintiff's contention that the investigation was inadequate or "heavy handed" does not materially advance her pretext argument. It is well established law that:

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons.

Fuentes, 32 F.3d at 765 (citations and internal quotation marks omitted) (emphasis in original); see also Keller, 130 F.3d at 1109 (the relevant inquiry at the pretext stage is "not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination") (internal quotation marks and citation omitted); Richards v. Centre Area

18

Transportation Authority, 2010 WL 411743 at *9 (M.D.Pa. 2010) (pretext is not demonstrated by showing that the investigation was faulty or its conclusions were wrong; what is important is whether there is evidence that shows the defendant did not act for its proffered reason). It is not for this Court to determine the soundness of the Defendant's decision in this regard. Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 332 (3rd Cir. 1995) ("[W]e do not sit as a super-personnel department that reexamines an entity's business decisions.") (alterations in original).

Finally, the fact that the Plaintiff was ultimately exonerated is similarly of no moment. The appropriate inquiry is whether sufficient evidence exists to raise an issue of fact as to retaliatory animus at the time the adverse employment actions were taken. See Connolly v. Pepsi Bottling Group, L.L.C., 2008 WL 4412090 at *10 (W.D.Pa. 2008) ("[T]he court cannot replace the defendant's business judgment which was based upon information known at the time of the [adverse action] with a judgment made after additional mitigating evidence, not known at the time of the decision, was presented."); aff'd, 347 Fed. Appx. 757 (3rd Cir. 2009). The fact that a completed investigation may have revealed a Defendant's well-founded suspicions to be unsupported is irrelevant in the pretext analysis. See e.g., Knight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998) ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment."); Buford v. City of Atlanta, GA, 2008 WL 552933 at *10 (N.D.Ga. 2008) ("Whether Plaintiff actually committed a violation is not the issue that is relevant to the pretext analysis. The relevant issue is whether [the employer] honestly believed that Plaintiff's behavior ... justified [the adverse employment action].").

In sum, for the reasons previously discussed, the Plaintiff has failed to raise a triable issue of fact as to pretext. Consequently, the Defendant's motion for summary judgment will be granted.

### IV. Conclusion

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOYCE COUNTS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 08-85 Erie |
| v. ) | |
| ) | |
| ERIC K. SHINSEKI, ) | |
| Secretary, Department of Veterans Affairs, ) | |
| ) | |
| Defendant. ) | |

## ORDER

AND NOW, this 23rd day of September, 2010, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgment [Doc. No. 33] is GRANTED. JUDGMENT is hereby entered in favor of the Defendant, Eric K. Shinseki, Secretary, Department of Veterans Affairs, and against the Plaintiff, Joyce Counts.

The clerk is hereby directed to mark the case closed.

                                                                            s/ Sean J. McLaughlin
                                                                            United States District Judge

cm: All parties of record.